UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 05-381  (ADM/SRN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Erick Bernabe Santamaria, | |
| Defendant. | |

Omar Syed, Esq., Assistant U.S. Attorney, on behalf of Plaintiff.

Lyonel Norris, Esq., on behalf of Defendant Santamaria.

___

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter came before the undersigned United States Magistrate Judge on Defendant Erick Bernabe Santamaria's Motion to Suppress Statements, Admissions, and Answers, and Motion to Suppress Evidence Obtained as a Result of Search and Seizure. (Doc. Nos. 13 and 14). This matter is set to be tried before the Honorable Ann D. Montgomery, United States District Court Judge for the District of Minnesota, on January 17, 2006. This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, this Court recommends that Defendant's motions to suppress statements and evidence (Doc Nos. 13 and 14) be denied.

**I.   PROCEDURAL HISTORY**

1

On November 15, 2005, a one-count indictment was filed charging Defendant Erick Bernabe Santamaria ("Defendant Santamaria") with Possession with Intent to Distribute Methamphetamine in violation of Title 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).

Defendant was present and represented by counsel at the criminal motions hearing. Detectives Mari Askerooth and Noel Nelson testified on behalf of the Government.

## II.   FINDINGS OF FACT

**Testimony of Detective Mari Askerooth**

Detective Mari Askerooth ("Detective Askerooth") has been a police officer with the Minneapolis/St. Paul Airport Police Department for four years. (Testimony of Detective Askerooth "Askerooth Test.")). For the last eleven months, she has been assigned to the DEA drug interdiction task force. She has had training in investigation of narcotics violations as well as stops and arrests. In that capacity, Detective Askerooth testified that she first had contact with Defendant Santamaria on October 26, 2005, at the Hubert H. Humphrey ("HHH") Terminal of the Minneapolis/St. Paul Airport.

Detective Askerooth testified that she was on duty at the HHH Terminal at 6:00 a.m. on October 26, 2005. She and her partner, Detective Noel Nelson, were watching the early morning "red eye" Sun Country flights for the purposes of drug interdiction. Detective Askerooth testified that they were watching specifically those flights based on findings that drug traffickers transporting drugs often arrived on those flights.

On that day, Detectives Askerooth and Nelson were watching an inbound flight from Los Angeles, California when they observed Defendant exit the aircraft. They noted that Defendant was the last person to exit the plane, that Defendant was carrying a new looking black duffle bag, and that Defendant went

directly into a men's restroom. The Detectives waited for the Defendant outside the restroom and when he exited, they followed him to the baggage claim area. Detective Askerooth testified that the Defendant had shown characteristics consistent with those of a drug courier and decided to approach the Defendant. Once at the baggage claim area, Detective Askerooth approached the Defendant, introduced herself as a police officer, and showed her identification. Detective Askerooth testified that at this time, her partner Noel Nelson, approached another individual that had gotten off the same plane as the Defendant. While her partner was nearby and within sight, Detective Askerooth approached Defendant alone. Detective Askerooth testified that she asked the Defendant if she could talk to him and he responded that she could. She testified that she told the Defendant that he was not under arrest and explained her job to him. She asked if Defendant had any narcotics on his person and he responded that he did not. Detective Askerooth testified that she then asked Defendant if she could pat him down and if she could search his bag. She testified that the Defendant said she could.

    Detective Askerooth testified that she conducted a quick pat down of the Defendant and then searched his bag. She first searched the clothing on the top of the bag and then reached below the clothing and, upon doing so, she felt a hard crunchy material. Detective Askerooth testified that she pulled out two bags of a white crystal-like crunchy substance. The bags were partially wrapped in cellophane and electrical tape. She testified that, based on her experience, she recognized the type of wrapping as drug packaging. Detective Askerooth testified that she asked the Defendant what the substances in the packages was, and he responded he did not know. At that point, Detective Askerooth placed the Defendant under arrest.

    Detective Askerooth testified that, prior to the arrest, Defendant had been told he was not in

custody. He was not threatened, promised anything, handcuffed, or prevented from leaving. She testified that she only had to ask the Defendant one time if she could speak to him. The conversation took place in a public area and lasted five minutes. The conversation was in English and the Defendant appeared to understand what being said to him. Detective Askerooth testified that the Defendant's manner was calm, cordial, and matter of fact. She and her partner were in plain clothes and their weapons were covered.

After arresting Defendant Santamaria, Detective Askerooth testified that she and Detective Nelson, who had returned from talking with the other individual, walked the Defendant to the police department in the HHH Terminal. During the walk, Detective Askerooth asked the Defendant whether he had known the individual with whom Detective Nelson had been talking. Defendant replied that he did not. Once in the police department, Defendant was placed in a designated interview room and asked to sit down. His handcuffs were removed and the Detectives left the room to weigh and field test the drugs. After a few minutes, the Detectives returned to the room, and Detective Noel read Defendant his Miranda rights and began the interview.

The interview lasted about twenty minutes and was recorded. (See Gov. Ex. 1, CD recording of October 26, 2005 interview). During the interview, the Detectives talked about the possibility that cooperation would benefit the Defendant. Detective Askerooth testified that weapons were never displayed, force or threats were not used, no promises were made, and Defendant was not denied any physical needs. Detective Askerooth stated that Defendant never asked for an attorney. Nor did he ask, or indicate in any way, that he wanted to stop talking. Detective Askerooth testified that the tone of the interview was more intense then the tone of the initial encounter, but there was no yelling or coercion.

On cross examination, Detective Askerooth testified that the following characteristics that Defendant presented were consistent with him being a drug courier: First, Defendant arrived on a red eye flight from a source city such as Los Angeles, California. Detective Askerooth stated that tickets for such a flight are often less expensive and drug traffickers tend to believe there will be fewer law enforcement working at those hours. Second, Defendant exited the plane last. Detective Askerooth testified that exiting the place toward the end is often indicative of purchasing your ticket at the last minute. Third, Defendant carried a new black leather duffle bag. Detective Askerooth testified that drug traffickers often carry new bags that they receive each time they transport drugs. Fourth, Defendant went directly into a men's restroom. Detective Askerooth testified that drug couriers often carry the drugs on their body and then go the restroom to transfer them to their luggage. In addition, Detective Askerooth mentioned that the Defendant was suspicious because he did not appear to know where he was going, he milled around the baggage area, and he looked at his cellular phone several times.

Detective Askerooth acknowledged that people often fly the red eye flights just to save money. In addition, she admitted that when she stopped the Defendant, she did not know when he had purchased his ticket or where he was actually seated on the plane. She acknowledged that he could have been in the last seat on the plane or just waited for other people to exit the plane for other reasons. Detective Askerooth admitted that she did not know when the Defendant actually purchased his bag and, as such, she did not know if it was, in fact, new or just looked new. In addition, Detective Askerooth testified that Defendant was not the only passenger that went directly to the restroom and acknowledged that he could have just been using the restroom for its intended purposes after a three to four hour flight. Detective Askerooth did not agree that the fact that Defendant had just exited an overnight flight, was in a new airport

5

for the first time, and may have been waiting for a call, might explain why he seemed unfamiliar with his surroundings or looked at his cellular phone several times.

**Testimony of Detective Noel Nelson**

Detective Noel Nelson ("Detective Nelson") testified that he has been a Detective in the narcotics division of the Airport Police Department for four years. (Testimony of Detective Nelson ("Nelson Test.")). His duties include investigating narcotics violations and he focuses on narcotics interdiction. He testified that he has undergone training related to investigating narcotics violations with the DEA and conducting stops and arrests. Detective Nelson testified that he was present on October 26, 2005, when Defendant Santamaria was arrested.

Detective Nelson testified that at 5:30 a.m on October 26, 2005, he was on duty at the HHH Terminal with his partner Detective Askerooth. He stated that they were monitoring inbound red eye flights from Los Angeles, California, because it has been designated a source city. Detective Nelson testified that he and his partner observed the Defendant exit last from the plane and go directly to the restroom. The Detectives waited for the Defendant to exit the restroom and followed him down to the baggage claim area. They noted that Defendant was carrying a new black leather bag. Detective Nelson testified that Detective Askerooth then approached Defendant Santamaria, while he approached another individual about ten feet away. Detective Nelson testified that he began speaking to the other individual who had also aroused the Detective's suspicions. That individual, however, did not consent to a search of his person or baggage and was allowed to leave the airport.

Detective Nelson testified that the Detectives did not display their weapon or handcuffs. He also stated that he did not assist in placing Defendant under arrest. He testified that there were other passengers

in the area and that the Defendant was free to move about when he was talking to Detective Askerooth.

Detective Nelson testified that the walk to the police department took about 15 to 30 seconds. Upon arrival, Defendant was placed in an interview room while the Detectives had a quick conversation outside the room and then weighed and tested the narcotics. The Detectives then reentered the interview room and conducted a twenty minute recorded interview of the Defendant. Detective Nelson testified that he first read Defendant his <u>Miranda</u> rights from a card. He asked the Defendant if he understood his rights and the Defendant indicated he did. Detective Nelson then asked if the Defendant was willing to answer questions and the Defendant said he was. Detective Nelson testified that the Defendant never asked for an attorney, to stop talking, or to leave the interview room. Detective Nelson acknowledged that the Detectives raised their voices a few times during the interview for emphasis or for clarification. He testified that the Defendant appeared to understand the questions asked and answered each question asked of him. Detective Nelson also testified that no weapons, promises, or threats were used during the interview.

### III. DISCUSSION

Defendant Santamaria moves to suppress the evidence obtained as a result of search and seizure (Doc. No. 14), and to suppress statements, admissions, and answers (Doc. No. 13). Defendant argues that the search was conducted without a warrant, without reasonable suspicion, and without voluntary consent. The Government responds that reasonable suspicion was not necessary as the initial encounter with the Defendant did not constitute an investigatory stop or seizure, and the Defendant voluntarily consented to the search of his bag.

This Court finds that the initial encounter between Detective Askerooth and the Defendant was a

consensual encounter that did not require reasonable suspicion, and the Defendant voluntarily consented to the search of his bag. This Court also finds that Defendant's statements were made after properly receiving and validly waiving his Miranda rights. As such, this Court recommends that Defendant's motion to suppress evidence and statements (Doc. Nos. 14 and 13) be denied.

### A.   Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure

The Defendant argues that his stop by Detective Askerooth was not supported by the necessary reasonable articulable suspicion. The Government argues that the initial approach by Detective Askerooth was not a seizure under the Fourth Amendment, but rather was a consensual encounter and, as such, need not be justified by reasonable articulable suspicion. Thus, at issue in this case, is the nature of the initial encounter between Detective Askerooth and Defendant Santamaria. Specifically, at issue is whether the initial encounter was a seizure and required reasonable suspicion, or whether it was consensual encounter.

In Reid v. Georgia, the defendant was approached by drug interdiction officers at the Atlanta airport after arriving on an early morning flight from Fort Lauderdale. 448 U.S. 438 (1980). The officers indicated they stopped him because he allegedly fit the profile of a drug courier based on a compilation of several characteristics. The Court held that the stop was not supported by reasonable articulable suspicion as the agent could not, as a matter of law, have reasonably suspected the defendant of criminal activity on the basis of the observed characteristics. Id., at 441. In making its decision, the Court stated that any curtailment of a person's liberty by the police must be supported by at least a reasonable articulable suspicion that the person has engaged in criminal activity. Id., at 440. The Court also noted, however, that not all encounters between police and individuals involve 'seizures' of persons. Id., at fn*.

8

Justice Rehnquist dissented from the Court's finding in Reid for the reasons stated in the Court's prior decision in United States v. Mendenhall, 446 U.S. 544 (1980), and more specifically, because he believed that the police conduct in Reid did not implicate the Fourth Amendment rights of the defendant. In Mendenhall, a defendant observed walking through an airport was stopped by DEA agents and asked for identification. The Court's threshold question was whether the agent's initial stop of the defendant constituted a seizure within the meaning of the Fourth Amendment. Id.. The Court held that, based on the facts of the case, no seizure had occurred. Id., at 554. "We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id..

The dissenting opinion in Reid noted that the state courts decided the case before the Court's decision in Mendenhall, and did not consider whether the defendant in Reid had been seized. "Rather, those courts apparently assumed that the stop for routine identification questioning constituted a seizure, and addressed only the question of whether the agent's actions were justified by articulable suspicion." Reid, 448 U.S. at 443. Accordingly, the dissent opinion noted, the Court in Reid did not consider the initial seizure question when making its decision. Id..

The Eighth Circuit has agreed that not every encounter between law enforcement officers and an individual constitutes a seizure within the meaning of the Fourth Amendment. United States v. Favela, 247 F.3d 838, 840 (8th Cir. 2001). The court has also noted that Supreme Court jurisprudence appears to place police-citizen encounters into three categories:

> First, there are the communications between officers and citizens that are consensual and involve no coercion or restraint of liberty. Such encounters are outside the scope of the Fourth Amendment. Second, there are the so-called Terry-type stops. These are brief,

9

>minimally intrusive seizures but which are considered significant enough to invoke Fourth Amendment safeguards and thus must be supported by reasonable suspicion of criminal activity. Third, there are highly intrusive, full-scale arrests, which must be based on probable cause.

United States v. Poitier, 818 F.2d 679, 682 (8th Cir. 1987), citing United States v. Wallraff, 705 F.2d 980, 988 (8th Cir. 1983). The Eighth Circuit follows the finding in Mendenhall that whether an encounter constitutes a seizure, "turns on whether, considering the totality of the circumstances, 'a reasonable person would have believed that he was not free to leave.'" Favela, 247 at 840, (initial encounter with officers at airport was not a Fourth Amendment seizure because under the facts, a reasonable person would have believed she was free to leave), citing, United States v. Mendenhall, 446 U.S. at 554.

The Eighth Circuit has repeatedly found that, as long as a reasonable person would know they could refuse to cooperate, law enforcement officers approaching an individual in a public place and asking to talk to them constitutes a consensual encounter (if the person is willing to listen), not a seizure under the Fourth Amendment, and as such, does not need to be justified by reasonable articulable suspicion. United States v. Favela, 247 F.3d at 840; United States v. Smith, 82 F.3d 241, 243 (8th Cir. 1996); United States v. Green, 52 F.3d 194, 197 (8th Cir. 1995); United States v. Sadosky, 732 F.2d 1388, 1392 (8th Cir. 1984).

In Sadosky, agents approached the defendant at the Minneapolis-St. Paul airport because they had seen him at the airport several times within a short period of time, and because his other behavior also seemed unusual. 732 F.2d at 1390-91. They introduced themselves as law enforcement officers and said that they wanted to ask him some questions. Id.. Defendant initially agreed, but when asked to see his ticket and identification, Defendant refused. Id.. The agents then told the defendant that he was free to

go but they were investigating possible narcotics violations and because of his unusual behavior they wanted to ask him some questions. Id.. The defendant refused to allow a search of his bag unless he was under arrest and the agents informed him that he was free to leave but they were going to seize his bag so a drug dog could sniff search it. Id..

The court separated the encounter into two parts, the initial encounter, and after the defendant refused to show his ticket and identification. The court did not analyze the initial approach of the defendant under the Terry principles because, "merely by approaching Sadosky, by identifying themselves as law enforcement agents, and by asking Sadosky if he would be willing to answer their questions, [the agents] did not make a seizure of Sadosky's person. Sadosky, 732 F.2d at 1392; see also, Terry v. Ohio, 392 U.S. 1 (1968). As such, the court held that the initial approach of the defendant constituted a consensual conversation, not a seizure. Id.. The court did, however, find that, at the point in the conversation when the agents told defendant they were investigating possible narcotics violations and that they wanted to question him due to his unusual behavior, the defendant was the subject of a lawful Terry stop. The court found those statements transformed the initial consensual encounter into a seizure because they indicated defendant was a focus of the investigation and refusal to cooperate could lead to his arrest. Sadosky, 732 F.2d at 1392-93. "[A]n initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention ..., 'if in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" Id.., citing I.N.S. v. Delgado, 466 U.S. 210 (1984), quoting Mendenhall, 446 U.S. at 554.

However, asking for consent to search a suspect's belonging does not transform a consensual encounter into a seizure. See Smith, 82 F.3d at 243. In Smith, the defendant was stopped at the Kansas

11

City Amtrak station returning from Los Angeles by several drug interdiction officers because he was returning from a source city and because of some other irregular behavior. Id., at 242. The officers identified themselves, asked to speak with him, and asked to search his jacket. Id.. The defendant agreed and handed the officer the jacket, a search of which revealed cocaine. Id.. The court decided that the encounter between police officers and defendant was consensual, and as such, did not need to be justified by reasonable suspicion, despite the fact that the officer asked to search the defendant's jacket. Id., at 243. The Court noted that the defendant's consent to the search of his jacket prevented the encounter from becoming an investigatory stop "and therefore alleviated the need for the encounter to be justified by reasonable suspicion." Id..

Finally, in Green, a case which the Defendant cites in support of his motion to suppress, the defendant was stopped in an airport by a drug interdiction officer after arriving from Phoenix, Arizona, a designated source city. 52 F.3d at 196. The officer identified himself, asked to speak with her and to see her ticket and identification. Id.. He then told the defendant that he was looking for contraband such as narcotics and asked the defendant if she was carrying any narcotics to which she responded that she was not. Id.. The officer then asked the defendant if she had any narcotics in her bag and she said no. Id., at 196-97. When asked if he could search her bag, the defendant refused, and the officer told her he wanted a trained narcotics dog to sniff her bag. Id., at 197.

Similar to its decision in Sadosky, the court separated the encounter in Green into two parts. The court held that the initial contact between the officer and the defendant was consensual and the defendant's Fourth Amendment rights were not implicated. Id.. The defendant was approached in a public place, the officer identified himself, asked to speak with the defendant, and the defendant agreed. Id.. The court

held, however, that when the officer, after the defendant denied permission to search her bag, informed her that he would detain her bag so that a dog could sniff search the bag, the encounter became an investigatory stop and required either consent or reasonable suspicion. Id..

Thus, under Eighth Circuit jurisprudence, it is not a seizure, but rather, a consensual encounter when law officers approach an individual in a public place, ask to talk to them, ask to search their belongings, and search their belongings after receiving valid consent. However, once the individual in the consensual encounter denies consent to search their person or belongings, or no longer feels free to leave the conversation, the encounter may be transformed into a seizure and need to be justified by reasonable suspicion.

This Court finds that, based on the facts in this case and the relevant case law, the initial encounter between Defendant Santamaria and Detective Askerooth was a consensual encounter, not a seizure, and, as such, reasonable suspicion was not required and need not be analyzed. Defendant Santamaria was approached in a public place. Detective Askerooth identified herself as a police officer and asked the Defendant if she could talk to him and he responded that she could. She told Defendant that he was not under arrest and explained her job to him. Detective Askerooth then asked the Defendant if he had any narcotics on his person and he responded that he did not. Detective Askerooth then asked Defendant if she could search his bag and Defendant consented. That Detective Askerooth asked to search Defendant's bag did not transform the initial consensual encounter into an investigatory stop. See Smith, 82 F.3d at 243. There is no evidence to suggest that Defendant's consent was not voluntary or was the product of coercion. See Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). There is also nothing in the record to support a finding that a person in Defendant Santamaria's situation would have reasonably

believed that he was not free to leave the encounter with Detective Askerooth. Indeed, that another suspect was approached and questioned approximately 10 feet away from the Defendant, but was allowed to leave when he refused a search, gives support to the notion that Defendant Santamaria would have reasonably known he could deny the search and end the encounter. Accordingly, the encounter between Detective Askerooth and Defendant Santamaria was a consensual encounter and reasonable suspicion was not necessary. Consequently, the evidence discovered during the search of his bag should not be suppressed.

        **B.**      **Defendant's Motion to Suppress Statements, Admissions, and Answers**

Defendant Santamaria moves to suppress the statements he made during the October 26, 2005 interview after his arrest. (Doc. No. 13). This Court finds that Defendant Santamaria's statements should not be suppressed because they were voluntarily made after he was properly informed of his Miranda rights, and knowingly and voluntarily waived them.

        **1.**      **Defendant Santamaria was informed of his Miranda rights on October 26, 2005, and knowingly, voluntarily, and intelligently waived them.**

Before any evidence obtained as a result of a custodial interrogation may be used against a defendant at trial, the Fifth Amendment requires that a defendant in custody and subject to interrogation by law enforcement agents be advised of his constitutional rights and make a knowing, intelligent and voluntary waiver of those rights. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Suspects must be informed of these Miranda rights before questioning begins. Id. at 469-70. Statements elicited from a suspect in violation of Miranda are inadmissible. Stansbury v. California, 511 U.S. 318, 322 (1994). After the warnings are given, if the suspect indicates that he wishes to assert these rights, the interrogation must

stop.  Miranda, 384 U.S. at 473-74.

After being informed of his Miranda rights, a suspect's waiver of his Fifth Amendment privilege against self-incrimination is only valid if it is voluntarily, knowingly, and intelligently made.  Id. at 444; United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002).  It is the Government's burden to show by a preponderance of evidence that the suspect's waiver meets these standards.  Miranda, 384 U.S. at 473; Colorado v. Connelly, 479 U.S. 157, 168 (1986).  A waiver is knowing if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986).  It is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception."  Id.  While courts will not presume a waiver from a defendant's silence or subsequent confession alone, an express waiver is not necessary.  North Carolina v. Butler, 441 U.S. 369, 373, 375-76 (1979) (explicit waiver not necessary to show defendant waived right to remain silent when defendant volunteered incriminating statements); United States v. Barahona, 990 F.2d 412, 418 (8th Cir. 1993)(valid waiver inferred even though defendant refused to sign waiver form because defendant clearly understood rights and was cooperative with police); United States v. Duque, 62 F.3d 1146, 1152-53 (9th Cir. 1995)(valid waiver inferred because, after having been given Miranda rights and asked if he was "of mind to speak with officers," defendant made incriminating statements).

Based on the testimony by Detective Askerooth and Nelson about the October 16, 2005 interview, this Court finds that Defendant Santamaria made his statements during the interview after he was informed of his Miranda rights and validly waived them.  Defendant Santamaria had been arrested at the time of the interview.  He was interviewed by Detective Nelson and Askerooth in an interview room at the HHH Terminal Police Department.  As he was in custody, he was properly read his Miranda rights from a card

at the start of the interview. After the Miranda warning was given, Defendant Santamaria was asked if he understood his rights and indicated he did. Defendant Santamaria was then asked if he was willing to answer questions and indicated he was. Defendant Santamaria then proceeded to provide answers to every question asked of him. Both Detectives testified that Defendant never asked for an attorney or to stop the interview. There is nothing in the evidence to suggest that Defendant Santamaria's waiver was not made knowingly or voluntarily. He was advised of his rights, indicated he understood his rights, asked if he would answer questions, he indicated he would, and then gave responsive answers to each of the Detectives' questions, all of which in combination constitute a voluntary and knowing waiver of his rights.

### 2.     Defendant Santamaria voluntarily made the October 26, 2005 statements

In addition to informing a suspect of their rights and receiving a valid waiver of those rights, a statement or confession that is involuntarily made by a suspect is violative of his or her due process rights. Haynes v. Washington, 373 U.S. 503, 513-514 (1963); United States v. Kime, 99 F.3d 870, 878-79 (8th Cir.1996). If a statement is induced by threats, promises, or by any other way in which the suspect's will is overborne, the statements are not voluntary and are inadmissible. Haynes, 373 U.S. at 513. Whether a confession is the involuntary product of coercion is judged by the totality of the circumstances, including an examination of both the conduct of the officers and the characteristics of the accused. Wilson v. Lawrence County, 260 F.3d 946 (8th Cir.2001). The question of whether a statement is voluntary focuses on: (1) the conduct of law enforcement officials in creating pressure; and (2) the suspect's capacity to resist that pressure. Mincey v. Arizona, 437 U.S. 385, 399-401 (1978) (confession involuntary when continued police interrogation of hospitalized suspect overwhelmed suspect's free will); Davis v. North Carolina, 384

U.S. 737, 752 (1966) (confession involuntary when police repeatedly interrogated jailed suspect held incommunicado over 16-days). In addition, the coercion inducing the involuntary statement must be done by a state actor. Connelly, 479 U.S. 157 (1986). Among other factors commonly considered in assessing the totality of the circumstances surrounding testimonial evidence supplied by a defendant are: (1) the location of the questioning; (2) whether Miranda warnings were given; and (3) whether the accused initiated contact with law enforcement officials. Battle v. Delo, 19 F.3d 1547, 1563-64 (8th Cir. 1994) (confession voluntary when defendant with eighth-grade education given multiple oral and written Miranda warnings and waived Miranda rights, modified, 64 F.3d 347 (8th Cir. 1995)); United States v. Hatten, 68 F.3d 257, 262 (8th Cir.1995) (confession voluntary when defendant initiated exchange which led to his incriminating statements).

Based on Detective Nelson's and Askerooth's testimony about the October 26, 2005 interview, as well as the recording of the interview, this Court finds that the Defendant was not coerced into making his statements. Rather, the statements were voluntarily made after properly receiving and validly waiving his Miranda rights. No promises or threats were made during the interview. Defendant did not appear intoxicated during the interview and appeared to understand the questions. There is nothing in the record to suggest that the Detective's conduct created any undue pressure on Defendant, that Defendant was particularly susceptible to coercion, or that his will was in any way overborne. That the Detectives raised their voices during the interview for emphasis or clarification does not rise to the level of coercion from which Defendants are to be protected. Defendant Santamaria answered the questions asked and the interview only lasted for twenty minutes.

Given the foregoing, Defendant Santamaria's statements from October 26, 2005, were voluntarily

made after waiving his <u>Miranda</u> rights. Accordingly, his motion to suppress statements (Doc. No.13) should be denied.

## V. RECOMMENDATION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Santamaria's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 13) be **DENIED**; and

2. Defendant Santamaria's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 14) be **DENIED**.

Dated: December 21, 2005              s/Susan R. Nelson
                                      SUSAN RICHARD NELSON
                                      United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **January 4, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made. Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by (same date as above), 2005 a complete transcript of the hearing. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.

19